IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 29, 2020

## STATE OF TENNESSEE v. EDWARD RUDOLPH WYSE, JR.

**Appeal from the Circuit Court for Cocke County**
**No. 7399     James L. Gass, Judge**

_____

### No. E2019-01454-CCA-R3-CD

_____

The defendant, Edward Rudolph Wyse, Jr., appeals his 2019 Cocke County Circuit Court jury convictions of rape and incest, challenging the denial of the motion to suppress his statement to the police, the sufficiency of the convicting evidence, and the propriety of the sentence.  The trial court did not err by denying the defendant's motion to suppress the statement.  Sufficient evidence supports the defendant's conviction of incest, and that conviction is affirmed.  Because the State failed to produce any evidence that the defendant used force or coercion to accomplish the sexual penetration of the victim, we reverse the conviction of rape and dismiss that charge.  Because the trial court erroneously failed to consider probation as a sentencing alternative and because our dismissal of the rape charge impacts the defendant's eligibility for other sentencing alternatives, we reverse the sentencing decision of the trial court and remand the case for a new sentencing hearing for the conviction of incest.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Remanded in Part; Reversed and Dismissed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Brett A. Cole, Seymour, Tennessee, for the appellant, Edward Rudolph Wyse, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Assistant Attorney General; James B. Dunn, District Attorney General; and Tonya D. Thornton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In October 2016, the Cocke County Grand Jury charged the defendant with two counts of rape and two counts of incest related to the abuse of his seventeen-year-old daughter, H.W.[1] Prior to trial, the trial court granted the defendant's motion to sever offenses, and the case proceeded to trial on one count of rape and one count of incest in October 2018.[2]

At trial, the 19-year-old victim testified that she was removed from the family home because of family problems, explaining "we weren't clicking as good as we used to. We always argued." The victim said that she told friends that she "always got the discipline" while her brothers were "the center of attention" and that, in response, those same friends convinced the victim that the defendant "was trying to attempt to rape me" or "trying to plot something against me." She claimed that, as a result of pressure from her friends, she "created a false thing about my dad raping me." The victim testified that she did not know what it meant to have sex and described rape as "[w]here someone puts hands on you and has sexual intercourse with you without your consent."

The victim testified that on the morning of October 29, 2016, she waited until the defendant left for work and then "decided to go to the bathroom, and I notice[d] there wasn't any toilet paper in the bathroom, so I used a rag." She explained that she "didn't even notice anything" on the rag that she used to clean herself. She put the rag into the dirty clothes bin and got ready for school. At school, her friends "noticed that I was upset about something. They kept bothering me and pestering me until I came out and told them what was bothering me." She said that she told her friends that she "felt like I was unwanted from my family. I felt like I was misplaced in the wrong time at all of my family." The victim said that she "was depressed" and that she had "slit my wrist before because I was afraid that I wasn't worthy enough for my family."

The victim recalled that she was scheduled to see her "counselor after second block" to discuss her "ADD medicine, to see if it was still working and helping me focus on work." She testified that she told her counselor that she "felt like I was about to be raped by my father, the way my friends described it. And I was worried, and I didn't want to be able to feel that way and get that from my father. And at the same time I was doubting it." She said that her counselor "jumped in" and "called her boss and told her for me to tell the cops about it." The victim insisted, however, that she told her counselor that she "didn't want to do anything about it because I wasn't sure about my dad trying to attempt that."

---

[1]     As is the policy of this court, we refer to the victim by her initials.
[2]     After the trial, the State dismissed the remaining counts of the indictment.

The victim admitted that she told the police that the defendant had raped her that morning, but she maintained that she had only done so "because I was really upset. I lost track of thought of my mind because I was actually panicking." The victim first said that when she went to the hospital, she told officials that the defendant had attempted to rape her. Then she claimed that she did not remember what she had told hospital personnel and that she thought she "might have blacked out, because sometimes I black out under pressure."

After leaving the hospital, the victim went to stay with a family friend for a couple of weeks. The victim initially claimed that she did not remember going to a place called Safe Harbor or participating in a forensic interview with Jenny Stith from Safe Harbor. Upon further questioning, however, the victim said that she recalled Ms. Stith's asking her questions "about what was mostly stressing me out about the family, what made me mostly want to leave." The victim said that she told Ms. Stith that she "just felt unwanted and needed from the house." The victim admitted that she told Ms. Stith that the defendant had raped her but qualified her answer, saying, "I knew it obviously wasn't true, because people kept on pressuring me." The victim claimed that she could not recall what details she had given Ms. Stith about the rape. Upon being shown a short clip from the forensic interview, the victim still insisted that she had no recollection of having told Ms. Stith the same version of events that she had already told her school counselor, the medical personnel at the hospital, and Detective Derrick Webb. Instead, she claimed that the family friend with whom she was staying at the time told her to "explain it this way. They'll believe you more."

The victim acknowledged that she had gone to speak to the prosecutor more than once prior to the trial and that the victim-witness coordinator had also been present during those visits. The victim admitted that, during one such meeting, she "just pretty much told you guys that I cut my wrist over losing my family over this court case, and pretty much nobody was listening to what I had to say." The victim insisted that the defendant had not raped her and said that she had accused him of raping her "[b]ecause I was upset. I didn't know what I was doing. I was just furious at my family." The victim said that she had lied during her previous interviews, saying, "My dad didn't really rape me." The victim acknowledged having asked the prosecutor to dismiss the charges against the defendant "[b]ecause my dad don't deserve it. My dad deserves a second chance, because I believe in second chances. And pretty much I didn't like the way it was going and I knew that I would wind up getting caught in my lie." The victim said that she felt like she "screwed everything up" and that she wanted to go home because she "didn't realize how much I missed my mom and dad until they were gone."

When asked during cross-examination why she would want to return home if the defendant had hurt her, the victim replied, "Either way, if he hurt me or not, I would

still give him a second chance, because he -- like everybody says, everybody deserves a second chance. If they screw it up, they're done." The victim testified that, on October 19, 2016, she "went to the bathroom" and that she noticed that "[a]round the rims were wet and I didn't know what it was." She sat down in the wet substance and then cleaned it with a rag that was laying on the floor. She said that she used the same rag to clean herself after urinating.

The victim acknowledged having told defense counsel approximately a month and a half before the trial that her original allegation was a lie. She insisted, however, that no one had asked her to recant. She said that she did not have any contact with the defendant after October 19, 2016.

Newport Police Department Detective Derrick Webb testified that, on October 19, 2016, he responded to a call from Cocke County High School "regarding a sexual assault that a student had disclosed to a guidance counselor." Upon his arrival, he spoke with the then 17-year-old victim, and she "stated that that morning prior to school . . . she had had sexual intercourse with her father." Detective Webb drove the victim "to the Tennova Hospital here in Newport to basically let them do a sexual assault kit and check her out and make sure that she was okay." Detective Webb collected the sexual assault kit and placed it in the evidence locker to be transported to the Tennessee Bureau of Investigation ("TBI") for forensic testing.

That same day, Detective Webb and two patrol officers went to the home the victim shared with her family, where they spoke to the defendant. Detective Webb told the defendant "that there were some allegations of sex abuse by his daughter, and we were there to collect some evidence." The defendant consented to the search and "was very cooperative." The defendant agreed to come to the police department on the following day for an interview.

The defendant arrived for his interview the next afternoon. During the interview, the defendant admitted having had sex with the victim before he went to work on October 19, 2016:

> On 10-19-16 I woke up around 4:50 a.m. and went to pee. Went into the living room started to check email and [F]acebook and looked into the kids rooms. Sat back down and then started in and out and I ended up in [the victim's] room. I sat down on the bed and talked and I don't remember if I pulled her pants off, it goes fuzzy. Then I rubbed her back and we started doing it. I think I pulled down my underwear. She was laying on her side. I put my fingers in her sometime between

when I came into her room and when we actually had sex. I don't remember if I ejaculated on her or on the bed. I ain't never had condoms in the house. After it was over I stood up and I told her I loved her and I would see her this evening. I went to the bathroom and stood there in the mirror looking at myself w[ith] disgust. I got ready to go to work and about ten till six I left for work. I sat on the couch a while after I went to the bathroom.

At the conclusion of the interview, which lasted approximately an hour and a half, the defendant signed a statement that had been drafted by Detective Webb.[3] The defendant's statement was also recorded. Following the interview, the defendant left the police station with his wife. The defendant was arrested several days later. During the booking process, the defendant consented to the taking of a DNA sample via buccal swab.

Detective Webb testified that he questioned the victim about the particulars of the offense and that he observed the forensic interview. He said that the victim provided the same version of the offense during the forensic interview that she had provided during his interview with her.

During cross-examination, Detective Webb acknowledged that he attempted to corroborate the victim's version of events during his interview of the defendant. He agreed that the victim did not mention that the defendant had rubbed her back or that he had penetrated her vagina digitally before they had sex. Detective Webb also agreed that the defendant expressed concern about the wellbeing of his family, noting that he was the sole provider. Detective Webb conceded that when the defendant remarked that he did not want to go "to jail for the rest of his life," he told the defendant "hey, look, man, there's been people that have gotten probation on similar cases."

Detective Webb testified that the evidence collected in the case included a "swab" of the victim's right leg, the bedding from the victim's bedroom, and some items of clothing. He agreed that, to his knowledge, the defendant's DNA was not discovered on any of the items of evidence collected from the house.

TBI Special Agent and Forensic Scientist Kim Lowe testified that she identified sperm cells upon microscopic examination of "the external vaginal swabs" taken from the victim, so she "went ahead and did the DNA analysis" on those swabs. DNA analysis established that "the DNA obtained is a mixture from at least two individuals" and

---

[3]     We address the circumstances of the defendant's giving of the statement in more detail in our discussion of the denial of his motion to suppress the statement. Detective Webb's testimony at trial aligned with his testimony at the suppression hearing on this subject.

that "[t]he major contributor to the profile matches the profile from" the defendant while "[t]he minor contributor profile is consistent with" the victim.

During cross-examination, Agent Lowe testified that she did not detect the presence of semen on either the internal vaginal swabs or the swab of the victim's right leg. She said that, because she confirmed the presence of the defendant's DNA on the external vaginal swabs, she did not test the underwear that Detective Webb collected. Agent Lowe agreed that it was theoretically possible for sperm cells to be transferred from either a toilet seat or a cloth rag, but she noted that a rag would have "to be quite wet" with semen to effectuate such a transfer.

Kim Hudson, the Victim-Witness Coordinator for the Cocke County District Attorney's Office testified that, during a meeting with the victim, the victim said that she and the defendant "had had sex" and "[t]hat it didn't matter." Ms. Hudson recalled that the victim became "really, really upset and begg[ed] us not to move forward with the case." When the prosecutor told the victim that the State would not dismiss the charges against the defendant, the victim "said if we didn't dismiss the case she was going to kill herself." At that point, Ms. Hudson stayed with the victim while the prosecutor contacted the mobile crisis unit of the police department. The victim was then transported to the hospital.

At the conclusion of Ms. Hudson's testimony, the State rested.

The defendant's wife, Tina Wyse, testified that she and the defendant had been married for 16 years and that they shared three children, including the victim. She recalled that, in October 2016, she and the defendant "were both stressed on a couple of things going on in our lives," including "another court case" involving one of their sons. Ms. Wyse also noted that, during that same time, the victim "was having issues. She was constantly lying and . . . stirring trouble up in the house between all of us." She explained:

> She would get angry with me if I would try to punish her, I guess you could say, and she would run to [the defendant], and [the defendant] would come to me, and then we would argue, or her and her brother would get in an argument and I would try to intervene and she would go to [the defendant], and [the defendant] would come yell at the brother, and then I would have to intervene to kind of set the story straight.

She said that "[t]here was a lot of tension" in the home.

Ms. Wyse described the morning of October 19, 2016, as "just a regular ol' morning," saying that she woke her children and gave them their clothes for school. She remembered that the victim was still not up and dressed by the time Ms. Wyse had gotten dressed, so she went back into the victim's room and told her to get up. Ms. Wyse said that the victim did not behave unusually that morning.

Ms. Wyse testified that she did not believe the victim's allegation against the defendant, noting that the victim had not withdrawn from the defendant and that she "knew something wasn't right" "even that day at the schoolhouse." Ms. Wyse recalled that the victim had "been trying for like a year or so to try to get out of the house." She remembered that when she was called to the victim's school, she assumed that the victim had accused Ms. Wyse "of hitting her or something" and said that she had told her sons that she "was probably going to jail, there weren't no telling." Ms. Wyse stated that she was concerned "that [the victim] was going to be pregnant, because that was my biggest fear was her being pregnant before she graduated school." After learning that the victim had claimed that the defendant had raped her, Ms. Wyse spoke with the defendant on the telephone and "told him, you know, if you come up here they're going to arrest you." She said that when she repeated the victim's allegation to him, the defendant "just started crying" and asked "why would she do that?" Ms. Wyse said that the defendant "was up most of the night and all day physically sick throwing up because of what was going on." The next day, she drove him to the police department so that he could speak to Detective Webb.

Michael Wyse, the defendant's oldest son, testified that on the morning of October 19, 2016, he heard the defendant get out of bed and then saw the defendant walk down the hall, checking first the room that Michael shared with his brother Mickey and then peeking "into the crevice of" the victim's bedroom door. He said that the defendant then walked "back towards the living room and sat down on the couch." Mr. Wyse recalled that he could hear the victim snoring at that time. He also noted that he would have heard the defendant enter the victim's bedroom because "[s]he's got everything piled up in front of the door. . . . Her room was always a mess. You would have never been able to walk through there." Mr. Wyse said that he did not go back to sleep that morning. He testified that he did not credit the victim's allegation against the defendant "[b]ecause I was the one that was awake to watch every movement that he made that day."

Following a full *Momon* colloquy, the defendant elected to testify.

The defendant testified that in October 2016, "[m]ost of the time it was a rocky situation trying to keep things calm in the house" because the victim "didn't seem to agree with my objectives on how she should present herself in public or how she should present herself to go to school and how she fought with her siblings." He recalled that the victim believed that she should be able to do as she pleased and that his strict "no boyfriend

-7-

policy" caused friction between the two of them. The defendant added that the victim often lied "[t]o try to get her way," saying, "I mean there's several times she would do things right in front of us and we would confront her on it, and she was like, no, I didn't." He said that the victim had expressed a desire to run away.

The defendant testified that he woke earlier than usual on October 19, 2016, because he was worried about conditions at his job. He said that he checked on all three of his children, as was his habit, peaking through the crack in the victim's bedroom door to check on her. He recalled that the victim "looked like she was knocked out pretty good." After checking on the children, the defendant went into the bathroom nearest the victim's room and masturbated while standing over the toilet. He said that although he could not "technically recall" whether he had used any particular item to clean up after himself, he said that "it would have been either tissues that were right there, or it would have been a cloth or something." He then got ready and left for work after watching the news.

The defendant testified that he first learned of the victim's allegation when he spoke to his wife after he returned home from work. He described receiving that news as "devastating" and "heartbreaking." The defendant said that he agreed to go to the police station to be interviewed because he "didn't want to say no. I didn't want to try to look like I was trying to avoid him or anybody to make myself look guilty of anything. I wanted to cooperate with all hands, with no disregard." He recalled that he did not sleep well on the night before his interview and that he was very tired when he arrived at the police station. He said that he initially denied having raped the victim because he "would never do that to my daughter." He said that "[a]t some point" he heard Detective Webb refer to the interrogation as a negotiation "in between my thoughts of trying to subside with what was going on and trying to keep myself together and not totally tore apart." The defendant stated that he anticipated being arrested after the interrogation and that, as a result, he feared "losing my family" and his family losing his income.

The defendant testified that he remembered Detective Webb telling him that another person accused of similar behavior had received a sentence of probation in a case that involved similar allegations. When asked whether that statement had "any effect" on him, the defendant replied, "Yes, in a way it did. In a way, no." He said that he believed there was "[a] slight chance" that he would be given a sentence of probation if he confessed and that "that was the best chance that I was going to get to try to keep my family together."

During cross-examination, the defendant reiterated that he admitted having sex with the victim only because he thought it was "right to suffice to get my two boys at least back home with their mother instead of being destroyed and distraught and tore apart and their minds mentally broke down by this whole scenario." He acknowledged that

-8-

Detective Webb "probably" told him that he was not going to be arrested that day and admitted that he was not actually arrested following the interview.

Based upon this evidence, the jury convicted the defendant as charged of rape and incest. Following a sentencing hearing, the trial court imposed a total effective sentence of 10 years' incarceration.

In this timely appeal, the defendant challenges the ruling of the trial court denying his motion to suppress his statement to the police, the sufficiency of the convicting evidence, and the sentence imposed by the trial court.

## I. Motion to Suppress

Prior to trial, the defendant moved the trial court to suppress the statement he provided to Detective Webb. No copy of either the defendant's written motion or the State's written response has been included in the record on appeal. At the September 2018 hearing on the defendant's motion, he argued that his statement was coerced via promises of leniency.

DCS employee Gregory Boderck testified that on October 19, 2016, he "received a P1 referral in regards to allegations of sex abuse against [the defendant] regarding his daughter." Mr. Boderck traveled to Cocke County High School, where he interviewed the 17-year-old victim. After speaking with the victim, he met with the family and then traveled to the hospital with the victim, where she stayed overnight. The victim's mother gave consent for the victim to be placed into the temporary custody of a family friend after her release from the hospital.

On the following day, Mr. Boderck and Detective Webb met with the defendant at the Newport City Police Department. The defendant's wife drove him to the police department, and he was not placed under arrest at that point. The three men sat on opposite sides of a table in the "kitchen-style room where he was interviewed"; the defendant sat closest to the door, which was open to the hallway. The interview lasted approximately one and one-half hours, during which time the defendant did not ask for any breaks. Mr. Boderck said that he made no explicit promises of leniency and did not make any statement that he believed the defendant could have interpreted as a promise of leniency. At the end of the interview, the defendant left with his wife.

During cross-examination, Mr. Boderck conceded that he told the defendant that his job was different than Detective Webb's, saying, "I am not a police officer, and I was trying to explain to [the defendant] that I am not a police officer, that my job and responsibilities to the family are different than what Detective Webb's are." He admitted

-9-

that he told the defendant that "[i]t won't be good" if the defendant did not cooperate with the investigation. He acknowledged that Detective Webb told the defendant that another person in a situation similar to that of the defendant's had received a sentence of probation.

Detective Webb testified that on October 19, 2016, he was "called to the Cocke County High School regarding an allegation of a student there that had been involved in a sex crime." After speaking with the victim at the school, he accompanied her to the hospital. When he left the hospital, he went to the defendant's home on Buda Road "[t]o obtain evidence regarding the case." He said he spoke to the defendant, giving him "a brief summary of the allegations that were brought against him and why I need to collect types of bedding and other materials in relation to the crime." Detective Webb did not place the defendant under arrest but asked him to come to the police station on the following day for an interview.

The defendant and his wife came to the police station on the following afternoon, and Detective Webb and Mr. Boderck interviewed the defendant in an interview room. The defendant was not placed under arrest and was not handcuffed or shackled. The three men sat at a table, and the defendant sat nearest the open door of the interview room. Detective Webb provided the defendant with *Miranda* warnings and repeatedly assured him that he was not under arrest. He said that the defendant never asked to leave during the hour and a half interview. Detective Webb recalled that Mr. Boderck offered the defendant a break, but "[h]e just continued to talk, so there was no break taken." He added, "Towards the end of the interview, I asked him if he needed some water or anything, and he declined." Detective Webb described the defendant as cooperative and "very engaging."

Detective Webb denied making either promises or threats during the interview and specifically recalled saying, "I can't promise you anything." He testified that they discussed probation after the defendant "said that he was going to get 18 years for this," adding, "The only person that talked about jail was him." When the defendant mentioned the prospect of a lengthy jail term, Detective Webb told him "[t]hat there was a similar case that had recently been heard in Cocke County Court, and those defendants got probation." Detective Webb maintained, however, that he had not promised the defendant a sentence of probation and that he had not threatened the defendant with a sentence of incarceration, explaining, "I have no control over what the judge or anybody gives. That's beyond my pay grade. I can't promise anybody what they're going to get." He acknowledged that he told the defendant that he "would talk to the District Attorney's Office" if the defendant cooperated with the investigation.

During cross-examination, Detective Webb testified that it was his opinion that the best interrogation tactic was to "build a rapport with the person, you know, talk to

them like they're somebody, respect them, you know, everybody make mistakes . . . even though he . . . was alleged to have committed a crime, you know, you still talk to them like a human being." He acknowledged that the defendant initially denied committing the offense. Detective Webb conceded that he told the defendant that the "negotiations" would end if Detective Webb had other evidence that the crime was committed, explaining, "If I have the DNA evidence or any other type of evidence that says you are the person responsible for this crime, I don't need a confession." He agreed that, after the defendant said that he "didn't have a leg to stand on," he told the defendant, "That's why we're giving you an opportunity to help yourself."

The recording of the interview was not played at or exhibited to the suppression hearing or the trial. In consequence, no copy of the recording was included in the record on appeal.

At the conclusion of the hearing, the trial court found that, based on the testimony of Detective Webb and Mr. Boderck, "the defendant appeared at the police department of his own initiative, his own free will" and that "[he] actually was advised of his *Miranda* rights although he was not arrested or charged at this time with any criminal activity." The court observed that the defendant was not shackled, handcuffed, or placed in a locked room; that he was told repeatedly that he was not under arrest; and that he was allowed to leave at the conclusion of the interview. The court concluded that the "record is completely devoid" of any evidence that the defendant's statement was the product of coercion or threats. Instead, the court determined that the defendant's statement was given voluntarily. The court noted that, although Detective Webb told the defendant "he would put in a good word," he also told the defendant that he "could not promise any outcome." The trial court found that the record "does not contain any evidence that the accused was gripped by the hope of leniency to the degree that he could not and did not freely and rationally choose among available courses of action." Based upon these findings, the trial court denied the motion to suppress.[4]

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

---

[4] After granting the defendant's motion to sever Counts 3 and 4 from Counts 1 and 2, the trial court ordered that the statement be redacted to remove any reference to the severed counts.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)). Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544-45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *Blackstock*, 19 S.W.3d at 208 (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to

counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained." *Blackstock*, 19 S.W.3d at 208.

As an initial matter, we agree with the State and the trial court that the defendant was not in custody during any of the three interviews conducted in this case. A suspect "is in custody so as to be entitled to the warnings required by *Miranda*" when "under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996), and citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

In our view, the record supports the trial court's conclusion that the defendant's statement was voluntarily given and not the product of police coercion or promises of leniency. Although the defendant claims that his "characteristics put him at risk of giving an involuntary statement," he presented no proof of any characteristics that made him more vulnerable. The only proof at the hearing was the testimony of Detective Webb and Mr. Boderck, which evidence established that the defendant arrived at the police station of his own volition and that he was permitted to leave at the conclusion of the interview. The interview took place in an interview room, and the door of the room was left open to the hallway. The defendant was given the opportunity to take a break during the interview, which lasted only about an hour and a half, but he declined to take it. Despite the defendant's attempt to cherry-pick single statements by Detective Webb and Mr. Boderck, the record is clear that neither man threatened the defendant or promised him leniency in exchange for his confession. Consequently, we affirm the denial of the motion to suppress.

*II. Sufficiency*

The defendant contends that the evidence was insufficient to support his convictions. Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979);

*State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape is unlawful sexual penetration of a victim by the defendant" when "[f]orce or coercion is used to accomplish the act." T.C.A. § 39-13-503(a)(1). "A person commits incest who engages in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child." *Id.* § 39-15-302(a)(1). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age." *Id.* § 39-13-501(1). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." *Id.* § 39-11-106(14).

The evidence adduced at trial established that the victim reported to her school counselor that the defendant, her father, had raped her before school on October 19, 2016. The victim acknowledged that she repeated this claim to Detective Webb, hospital personnel, a forensic interviewer, the prosecutor, and the victim-witness coordinator. When questioned by the police, the defendant confessed having engaged in sexual intercourse with the victim. Forensic testing established that the defendant's semen was present on the external vaginal swabs taken during the victim's examination at the hospital on October 19, 2016. Although the victim and the defendant attempted to provide an innocent explanation for the presence of the defendant's semen, the jury was free to reject the explanation and conclude that the defendant had sexually penetrated the victim. This evidence, along with the clear evidence that the victim was the defendant's biological daughter, supported the defendant's conviction of incest.

We perceive a deficiency in the evidence presented on the elements of force and coercion relative to the defendant's conviction of rape.

-14-

As indicated, as charged in this case, rape is sexual penetration accomplished by force or coercion. *See* T.C.A. § 39-13-503(a)(1). Because the victim recanted her allegation of rape at trial, her testimony did not include any evidence that the defendant had employed either force or coercion to accomplish the act. The defendant's confession contained an admission that he had engaged in sexual intercourse with the victim, but it included no details that could be construed as force or coercion. During closing argument, the prosecutor directed the jury to the clip of the victim's forensic interview for the details of the rape in support of its allegation that the defendant had used force or coercion. The record clearly establishes, however, that the State played the four-minute clip of the forensic interview only for impeachment purposes.

When the prosecutor initially indicated an intent to display part of the forensic interview to the victim for the purpose of refreshing her recollection, the trial court warned that "[a] forensic interview must be qualified" before it could be admitted into evidence. The prosecutor responded, "It does if it's being used as a direct exam. It is being used in this case as impeachment." The prosecutor then indicated her intent to only "play a couple of excerpts, because there's a lot of things in there." The court observed that impeachment was "a legitimate goal in your efforts to offer this. I want you to be able to show the specific parts, because if it's to show the entire interview, I've got to follow the statutory requirement." The prosecutor again assured the trial court that the State only intended to offer the video for impeachment, saying, "[T]he jury is entitled to hear that under an impeachment. She has changed her story. There is an out-of-court statement that completely contradicts what she said here today." The State then played the short clip to impeach the victim's testimony at trial that the defendant had not raped her. The contents of the clip were not transcribed, and the recording was never offered into evidence.

"Our cases clearly establish that prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 803(26) provides an exception to the hearsay rule for a prior inconsistent statement of a witness that is "otherwise admissible under Rule 613(b) if" the declarant testifies at trial; the statement is recorded, signed by the declarant, or given under oath; and "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26). The latter finding requires the trial court to "conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness." *Id.* The trial court did not conduct such a hearing in this case because the prosecutor repeatedly indicated that she did not intend to offer the recording as substantive evidence. Because the State did not satisfy the requirements of Rule 803(26) and because the State did not seek the admission of the video clip, the jury was not permitted to use the victim's statements contained on the video recording as substantive

-15-

evidence of the defendant's guilt, and the prosecutor should not have argued otherwise during closing argument.

Finally, the victim's admission that she had previously reported that the defendant had "raped" her, particularly when viewed in light of the victim's unusual personal definitions of rape and sex, was insufficient to support a determination that the defendant's actions met the elements of rape as it was charged in this case. Because the State presented no substantive evidence that the defendant used force or coercion to accomplish the sexual penetration of the victim, we hold that the evidence was insufficient to support the defendant's conviction of rape. The absence of any evidence of force or coercion also precludes the reduction of the defendant's conviction to the lesser included offense of sexual battery. *See* T.C.A. § 39-13-505(a)(1). Accordingly, the defendant's conviction of rape must be reversed and the charge dismissed.

Additionally, we observe that, although the offense of rape may be established even in the absence of force or coercion, the presentment in this case specifically alleged that the rape of the victim was accomplished by force or coercion. Unfortunately, the trial court instructed the jury on the other modes of rape contained in Code section 39-13-503. Because this instruction modified the essential elements of the charged crime in a manner that permitted the jury to convict the defendant "'on a ground not charged in the indictment,'" *see State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (citation omitted), it resulted in a constructive amendment of, and a fatal variance from, the indictment. Although the proof was arguably sufficient to support a conviction of rape by a finding that the defendant's sexual penetration of the victim was "accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent," *see* T.C.A. § 39-13-503(a)(2), the State did not charge this mode of liability. By alleging a specific mode of liability, the State was obliged to prove that mode of liability and was precluded from achieving a conviction under a mode of liability different than that alleged in the indictment. *See Goodson*, 77 S.W.3d at 244 ("Put simply, not only must the government prove the crime it charges, it must charge the crime it proves."); *see also, e.g.*, State *v. Paul Richardson*, W2008-02506-CCA-R3-CD (Tenn. Crim. App., Jackson, Sept. 29, 2010) (constructive amendment and fatal variance occurred when the trial court instructed the jury on aggravated assault by intentionally and knowingly causing another to reasonably fear imminent bodily injury but the indictment charged the defendant with aggravated assault by knowingly causing bodily injury to another); *State v. Jamie Roskom*, M2006-00764-CCA-R3-CD (Tenn. Crim. App., Nashville, Feb. 9, 2007) (constructive amendment and fatal variance occurred in prosecution of violation of the sexual offender registry act when indictment alleged failure to timely register but proof showed the defendant's failure to report to local law enforcement agency within a week of his birthday); *State v. Atta Najjar*, W2003-00329-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 21, 2004)

-16-

(constructive amendment and fatal variance occurred when jury instruction in aggravated rape case allowed conviction based upon a theory of aggravated rape not alleged in the indictment). A constructive amendment of the indictment, not consented to by the defendant, by definition results in a fatal variance, for which "reversal is automatic." *Goodson*, 77 S.W.3d at 244 (citation omitted). Had we not already reversed the defendant's conviction based upon the insufficiency of the evidence, we would reverse it on this basis.

### *III. Sentencing*

Finally, the defendant asserts that the trial court afforded insufficient weight to the mitigating circumstances and, as a result, the sentence is excessive.

At the sentencing hearing, the defendant's youngest son, Mickey Wyse, testified that he had a good relationship with the defendant, describing the defendant as "a great father." He said that, without the defendant's financial contributions, the family was struggling to pay the bills. He stated that his schoolwork had suffered as a result of the defendant's incarceration and that he did not "feel safe" without his father at home.

The defendant's older son, Michael Wyse, also described the defendant as "a great father" and said that the family was struggling emotionally and financially without the defendant. He said that they were "almost about to lose the house, we're about to lose our car."

Tina Wyse testified that the defendant had "always provided for his family" and that "[h]e thought of us first before he did himself." She said that the defendant had always had a job and that the family "was always financially stable. We might not always have what we wanted, but we always had what we needed." Ms. Wyse said that, without the defendant's financial contribution, "we're fixing to be on the street, lose my car, everything." She testified that, if the defendant could be allowed to be to return home, "it would change a lot." She added,

> I mean, we're all struggling mentally, financially, spiritually, emotionally. I mean I've never had to do this alone and it's hard. I mean it's killing me. I'm down to a hundred pounds. I can't keep doing this by myself. I mean . . . me and Michael are always battling. I mean . . . we don't know how else to deal with our anxiety and stuff and we take it out on each other.

Virginia Underwood testified that she and the defendant, whom she had known for some 10 to 12 years, "were real close. I mean we could talk about anything." She said that the defendant had never made any unwanted sexual advances toward her. Ms. Underwood stated that the defendant's "family is struggling. All of them very much."

The victim testified that she was "very badly struggling. I stay up most of the nights having mental breakdowns about my dad, thinking of what I've done." She said that she felt "bad for what I did to my dad, knowing that it ain't true, knowing that he was in the jailhouse because of me." She insisted that she was not afraid of the defendant and "would be really happy to see" the defendant released into the community. She added, "My dad deserves to be out compared to what I did, and I really miss him, and I really want to see my family safe and my brothers back up to where they were."

During cross-examination, the victim acknowledged that, although she had testified during the sentencing hearing that everything was great and everyone got along prior to the trial, she had testified at trial that the family always fought. The victim said that she did not recall the prosecutor's telling her during their first meeting that, if he were convicted, the defendant would have to serve 100 percent of any sentence imposed.

The defendant told the court that he felt "really, really bad" and asked the court "to please have mercy on me." He said that he wanted to "be home to help my family get back on track" and that he had confirmed that he could return to his previous job.

The State asked the trial court to apply enhancement factors (7), that the defendant committed the offense to satisfy his sexual desire, and (14), that he abused a position of private trust, and to impose the maximum sentences within the range. The defendant asked the court to mitigate the sentence based upon his lack of a criminal record, the testimony of the victim and the rest of his family, and his expression of remorse. The defendant also asked the court to "show some mercy and some leniency" to the defendant and his family and impose the minimum sentences within the range.

The trial court described the case as "one of the most tragic cases I've had come before me," noting that "the real tragedy here is the impact that . . . these actions and subsequent convictions have" had on the defendant's family. The court observed that the victim "when called to testify, knowing the severity of these allegations, did all that she could do in her mind to minimize [the defendant's] role in these events." In mitigation, the court recognized that the defendant worked to provide for his family and that he acted as "the cornerstone in the relationship with" his wife "to make sure that the household ran." The court also recognized that the defendant did "not have a lengthy criminal history." The court afforded great weight to enhancement factor (14), that the defendant abused a position of private trust, stating "that a daughter should be able to count on and trust and

-18-

find safe haven in either of their parents." The court found that factor (14) "outweighs any mitigating factors in this case."

Based upon these findings, the court imposed Range I sentences of 10 years for the rape conviction, the midpoint within the range, and six years for the incest conviction, the maximum within the range.[5] The court ordered the sentences to be served concurrently, for an effective sentence of 10 years' incarceration. The court stated that a lesser sentence would "diminish[] the seriousness of this case and all the facts that I have talked about here." The court also observed that the defendant had to register as a sex offender and to comply with the lifetime community supervision requirement.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

Contrary to the defendant's assertion, the court weighed the mitigating and enhancement factors, thoroughly considering each, and concluded that the enhancement factor based upon the defendant's abuse of a position of private trust outweighed all the mitigating factors. As to the defendant's claim that the trial court failed to afford sufficient weight to the mitigating factors, our supreme court has held that "[a] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion," *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008), and this court is not free to reevaluate the weight and value assigned to the factors found by the trial court.

At this point, we note that there appears to have been some confusion about the defendant's eligibility for alternative sentencing. The prosecutor appeared to believe, and indeed convinced defense counsel and the trial court, that the 100 percent service

---

[5]     A Range I sentence for rape, a Class B felony, *see* T.C.A. § 39-13-503(b), is "not less than eight (8) nor more than twelve (12) years," *id.* § 40-35-112(a)(2). A Range I sentence for incest, "a Class C felony, [is] not less than three (3) nor more than six (6) years." *Id.* §§ 39-15-302(b); 40-35-112(a)(3).

provision of Code section 40-35-501 necessarily required that the defendant be sentenced to confinement for his conviction of rape. Section 501, which "governs the percentages a defendant must serve prior to becoming eligible for release classification status in all ranges," T.C.A. § 40-35-501, Advisor Comm'n Comments, contains no such requirement. Instead, that section requires that "[a] felony sentence to the department of correction or to a local jail or workhouse" be served according to its provisions. T.C.A. § 40-35-501(a)(1). Rape is not included in the list of convictions that render a defendant ineligible for probation. *See id.* § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less; however, no defendant shall be eligible for probation under this chapter if convicted of a violation of § 39-13-213(a)(2), § 39-13-304, § 39-13-402, § 39-13-504, § 39-13-532, § 39-15-402, § 39-17-417(b) or (i), § 39-17-1003, § 39-17-1004 or § 39-17-1005"). A conviction of rape does render a defendant ineligible for a community corrections placement. *See id.* § 40-36-106(a)(1)(B) (excluding from community corrections eligibility those convicted of felony offenses "involving crimes against the person as provided in title 39, chapter 13, parts 1-5"). Because the defendant's sentence was 10 years or less and because rape is not listed as an offense for which probation is not available, the trial court was required to consider probation as a sentencing alternative in this case, and its failure to do so would justify a remand for a new sentencing hearing. Additionally, our reversal of the defendant's conviction of rape impacts the defendant's eligibility for a community corrections placement for his conviction of incest. Thus, the defendant is entitled to a new sentencing hearing.

## III. Conclusion

The trial court did not err by denying the defendant's motion to suppress the statement he provided to Detective Webb because no evidence supported his claim that the statement was coerced. The evidence presented at trial was sufficient to support the defendant's conviction of incest, and that conviction is affirmed. The evidence was insufficient to support the defendant's conviction of rape, and that conviction is reversed and the charge dismissed. Finally, although no error attends the application of the mitigating and enhancement factors, the trial court's failure to consider probation as a sentencing alternative as well as the reversal of the defendant's conviction of rape warrants a remand for a new sentencing hearing.

_____
JAMES CURWOOD WITT, JR., JUDGE